**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Crim. Case No. 26-15-JMC** |
| **v.** | |
| **JAVAN KING,** | |
| **Defendant.** | |

**UNITED STATES' MEMORANDUM IN AID OF SENTENCING**

From 2021 through 2025, Javan King abused his position as a Department of Justice Information Technology contractor to cause thousands of cell phones to be ordered that the Department did not need, which he then sold for personal profit. And what a profit it was. King personally received a staggering amount of money—more than $1.3 million—from the phones that he sold. He spent the fraud proceeds on a variety of things, including gambling, vacations, and a luxury SUV. As a result of his conduct, the Court should sentence him to 24 months in prison. Such a sentence would be sufficient but not greater than necessary to reflect the factors set forth at 18 U.S.C. § 3553(a).

**I.      Background**

King was born in Washington, D.C., where he grew up in exceedingly challenging circumstances. *See generally* PSR ¶ 44, 46-48. After high school, he attended the University of the District of Columbia and started working as a contractor for the Department of Justice through its Stay-in-School Program. He ultimately withdrew from college to work full-time as a DOJ contractor, which he did for more than twenty years before being fired last year because of his fraud scheme. PSR ¶ 63, 69-70. In his final year, he was earning approximately $130,000, which is roughly fifty-five percent more than the typical American household.  *See What is the income*

*of a US household?*, USA FACTS, https://usafacts.org/answers/what-is-the-income-of-a-us-household/country/united-states (last visited May 11, 2026) (noting that the median household income in the United States was $81,600 in 2024).

Unfortunately, King abused the trust placed in him as a DOJ contractor to embark on a brazen fraud scheme that cost the Department more than $1.3 million. Specifically, between 2001 and 2005, he caused the Department to order more than 4,800 phones that it did not need, which resulted in DOJ paying $1,319,172.85 to AT&T for the extra lines/phones. King sold the phones to various phone resellers, personally receiving $1,327,938.97 in the process.

The following email provides an example of King's scheme in action. On June 10, 2025, he emailed the DOJ department responsible for ordering mobile devices and requested 164 new lines/phones.

| From: | King, Javan (CRT) |
|---|---|
| To: | DOJ Wireless Services (JMD) |
| Subject: | Order For Processing |
| Date: | Tuesday, June 10, 2025 6:19:14 AM |
| Attachments: | Order for Processing 6 11 New Users.xlsx |

Good Morning. At your convenience, can I please have this order processed? Thanks

Javan King
███ Contractor
Office of Information Technology and Cybersecurity
Administrative Section | Civil Rights Division
Mobile: 202.███25 | Rm. 10.406a
Email: CRT-███████@usdoj.gov

The spreadsheet attached to the email noted that the new lines/phones were for 22 political appointees, 32 incoming criminal attorneys, 60 new employees, 35 incoming education attorneys, and 15 "Extra." The listed reasons were all bogus. King intended to sell all the phones.

As a result of King's request, the Department ordered 163 phones from AT&T, which shipped the devices to King at the DOJ Civil Rights Division's office in Washington, D.C. King then promptly sold them to Business-One, a phone reselling business based in Tennessee. Business-One paid him $170 for each phone. During King's scheme, that business ended up purchasing at least 3,275 phones from him, paying him more than $950,000.

King used a personal Yahoo account to regularly correspond with that business. For example, here is just one of many messages he exchanged with Business-One.



Notably, when the government executed a search warrant on King's Yahoo email address, emails between King and Business-One—including the one above—had been deleted. The government obtained these emails directly through Business-One.

Although King sold the majority of phones he fraudulently acquired to Business-One, he sold more than 1,500 phones to eight other businesses too. When one pushed back in June 2022 and requested proofs of purchase given the large number of phones he was trying to sell, King lied by emailing the following:

> Good morning. Hope all is well. I spent Saturday and Sunday trying to get receipt of the devices that I have. I guess that my issue is, I purchase unclaimed storage units that haven't been paid as my profession. It just so happened that I won this unit at auction and these were in the. [sic] The company doesn't keep records of whats [sic] in the storage unit therefore I can't get a receipt as well as they don't know the contents. I understand that you would need documentation for the 85 but would it be ok if I was able to send half of that (42) without documentation? That would be the last I send to you [sic] company. Please advise. Thanks[.]

Of course, his proffered reason was false. He was not in the profession of purchasing unclaimed storage units. He was a DOJ contractor engaged in a million-dollar phone scheme.

The scheme came to light when a private citizen in Kentucky contacted the Department in late August 2025 noting that she had learned that an iPhone that she had purchased online from Business-One belonged to the Department. She discovered as much when she took the phone to an AT&T store. That eventually led DOJ's Office of Inspector General to Business-One, which immediately led to King.

In November 2025, the United States served a target letter on King, informing him that he was the target of a federal criminal investigation. King promptly obtained representation through the Federal Public Defender's Office. The following month, the United States conducted a reverse proffer presentation for King's counsel, i.e., a PowerPoint presentation summarizing the case and

4

highlighting some of the key evidence.

In January 2026, King attended a meeting with the government, at which he fully confessed to his criminal conduct. During the meeting, he noted that the COVID-19 pandemic and the departure of one of his coworkers allowed him to take full control of the device management process. He also said he spent all the money from the scheme, most of it on gambling, specifically at MGM casinos and FanDuel. He also said he spent money on vacations and private school tuition and noted that he would try to stop gambling.

He also spent some of the fraud proceeds on a new luxury SUV. In July 2025, the month before he was fired, King purchased a $92,000 Range Rover. He made a $16,500 down payment,

 $15,000 of which he provided in cash. He told the presentence investigation report writer that he returned the vehicle to the loan provider. PSR ¶ 74. Indeed, as of May 11, 2026, multiple sites indicate that the VIN associated with the Range Rover that King purchased in July 2025 corresponds with the above vehicle and that it is being auctioned by the loan provider.

On February 10, 2026, King pled guilty to one count of mail fraud. Consistent with his pretrial release conditions, he has been attending Gambler's Anonymous meetings, which he told the presentence investigation report writer he has found helpful. PSR ¶ 59.

## II.    Sentencing Guidelines

The parties and PSR writer agree that the following guidelines apply.

| | | |
|---|---|---|
| USSG §2B1.1(a)(1) | Base Offense Level | 7 |
| USSG §2B1.1(b)(1)(H) | Loss Amount: More than $550,00 | 14 |
| USSG §3E1.1 | Acceptance of Responsibility | -3 |
| USSG §4C1.1 | Zero-Point Offender Adjustment | -2 |

PSR ¶ 26-36. King has no criminal history points and is in Criminal History Category I. PSR ¶ 39. Based on a total offense level of 16 and CHC I, the guidelines recommend a sentence of 21 to 27 months' imprisonment and a fine of $10,000 to $95,000.  PSR ¶ 81, 96.

### III.    The 18 U.S.C. § 3553(a) Factors

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

The section 3553(a) factors support a mid-guideline sentence of 24 months' imprisonment.

### A. The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense

King's criminal conduct was serious. Not only did he engage in a years-long scheme that involved him converting the phone procurement system into a personal slush fund generator, he did so while working as a U.S. Department of Justice contractor. Moreover, his criminal conduct was not limited to a few isolated incidents. Instead, it involved him repeatedly deciding to defraud DOJ. Each time he requested phones as part of the scheme, he was presented with a choice—to steal or not to steal. For four years, he repeatedly chose to steal and ultimately obtained nearly 5,000 phones, which he turned around and sold for more than $1.3 million. The retail value of the phones he sold was certainly much higher. The nature and circumstances of his offense and need for the sentence to reflect the offense's seriousness weigh in favor of a two-year sentence.

6

**B.  The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct**

Although the government hopes that King has been specifically deterred from engaging in additional criminal conduct, the Court's sentence must still promote respect for the law and deter the public from engaging in similar criminal conduct. Accordingly, this factor also weighs in favor a guideline sentence to make it clear to would-be government contractors that if they violate the trust that the government has placed in them and engage in a multi-year fraud scheme that costs the government more than $1.3 million, the penalty will include a significant period of incarceration.

**C.  The History and Circumstances of the Defendant**

King's history and circumstances are complicated. Like most defendants who appear before this Court, King did not enjoy an easy upbringing. *See generally* PSR ¶ 44, 46-48. He overcame many of the obstacles noted in the PSR to secure meaningful employment, which paid him well. Yet, he sabotaged the opportunities he enjoyed, including a $130,000 job, which so many Americans would love to have, by engaging in reckless criminal conduct. There is no doubt that his conduct was largely fueled by compulsive gambling, but he also used fraud proceeds to go on vacations and to make a down payment on a new Range Rover. On balance, considering his history and circumstances, including the fact that he met with the government and confessed his criminal conduct after receiving a target letter, something for which he should receive credit, a two-year sentence is warranted.

**D.  Unwarranted Sentencing Disparities**

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see also*

7

*United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533.

A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

According to the U.S. Sentencing Commission's Judiciary Sentencing Information ("JSIN"), "During the last five fiscal years (FY2021-2025), there were 645 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 16 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure." PSR ¶ 102. Eighty-six percent of those defendants received a prison sentence with the average length being 14 months. *Id.*

Here, a guideline sentence of 24 months would not lead to an unwarranted sentencing disparity for several reasons.

First, King was a Department of Justice contractor, which is unquestionably an aggravating factor and one that is not accounted for in his guidelines range. This is particularly true given that he did not receive a two-level Abuse of Trust enhancement under USSG §3B1.3 even though there is no question that he repeatedly abused the Justice Department's trust in him over multiple years.

Second, the JSIN data about average sentence length seems partially misleading because it includes sentencing information that predates the enactment of the zero-point offender provision. The zero-point offender provision became effective on November 1, 2023, which was the start of Fiscal Year 2024, but the data covers Fiscal Years 2021 through 2025. Thus, any zero-point defendants who were sentenced in Fiscal Years 2021 through 2023 did not receive the two-level reduction that King is receiving, but it appears, based on the Commission's statement regarding why the zero-point offender provision was adopted, that many judges varied downward before the provision was enacted when defendants had zero criminal history points.

> In promulgating this change, the Commission also considered the rates of departures and variances in cases involving offenders with no criminal history points. The Commission has long viewed the rates and extents of departures and variances from the applicable guideline ranges as a feedback mechanism from the courts that a particular area of the guidelines may warrant further review and possible amendment. In fiscal year 2021, 39.2 percent of offenders with zero criminal history points received a sentence within the guidelines range; by comparison, 47.4 percent of offenders with one criminal history point were sentenced within the guideline range. The Commission determined that the departure and variance rates for zero-point offenders, coupled with its recidivism data, warranted action.

U.S. SENT'G COMM'N, AMENDMENT 821, Reason for Amendment (effective Nov. 1, 2023).

Thus, including sentences before and after November 2023 in the JSIN data seems akin to comparing apples with oranges. A more accurate analysis about sentence length would include data about zero-point offenders with an Offense Level of 18 sentenced before November 1, 2023, and zero-point offenders sentenced on or after November 1, 2023, with an Offense Level of 16. The resulting data would likely better control for the Amendment's adoption.[1]

---

[1] Government counsel has not figured out a way to parse the Sentencing Commission's website and tools to control for these two scenarios. The Commission might make such data directly available to the Court upon the Court's request.

The JSIN data for the same fiscal years (FY2021-2025) for individuals with an Offense Level of 18 and CHC I, which is where King would fall pre-November 1, 2023, indicates that Courts sentenced 90 percent of defendants to prison with an average sentence of 20 months.

Third, although the PSR's JSIN discussion includes information about the average lengths of imposed sentences, the JSIN data from the Commission's website for Fiscal Years 2021 through 2025 included an important statistic that is not in the PSR, namely, that 24 percent of defendants with a final offense level of 16 and Criminal History Category I received a within-guidelines sentence. The following chart on the JSIN portion of the Commission's website shows as much.[2]



**Note:** The figure includes the 778 defendants reported to the Commission whose primary guideline was §2B1.1, with a Final Offense Level of 16 and a Criminal History Category of I, including defendants who received a §5K1.1 substantial assistance departure. Cases missing information necessary to complete the analysis were excluded from this figure. Defendants who received a §5K1.1 substantial assistance departure are included in this analysis but are excluded from other analyses below. As such, the number of defendants included in this analysis may exceed the number of defendants in other analyses. Total percentages displayed in the figure may not sum to 100% due to rounding.

Although the individual facts and circumstances of the cases referenced above are not known, the facts in King's case are, specifically, that he was a long-time Department of Justice contractor who used his position to commit a million-dollar fraud scheme over multiple years. That is an aggravating factor. In addition, the loss range in §2B1.1(b)(1)(H) that applies to King's conduct is $550,001 to $1.5 million. Stated differently, defendants who caused a loss of $550,001 received the same 14 level-increase as defendants who caused a loss of $1.5 million even though the financial damage that they inflicted or intended to inflict could differ by almost a million dollars. King's loss amount is clearly towards the top of that range given that he caused the

---

[2] There was only a marginal change when data was examined for defendants with an Offense Level of 18 and a Criminal History Category I. Twenty-six percent of those defendants received a within-guidelines sentence.

Department to lose more than $1.3 million and that he personally gained more than $1.3 million as well.

Based on the section 3553(a) factors, including the fact that roughly one-quarter of defendants with similarly situated guidelines ranges received sentences within the guidelines range, a two-year sentence in King's case would not lead to an unwarranted sentencing disparity.

## IV.    Restitution and Forfeiture

King caused the Department to lose $1,319,172.85 as part of his scheme. Accordingly, the Court should order restitution in that amount.

King personally earned $1,327,938.97 from the scheme. Although the Court already has issued a forfeiture money judgment in that amount, ECF No. 9, the United States requests that the Court orally reference forfeiture at King's sentencing hearing and include the forfeiture order as part of the judgment.

## CONCLUSION

The Court should sentence Javan King to 24 months' imprisonment to be followed by three years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:      /s/ Kondi J. Kleinman
Kondi J. Kleinman, Cal. Bar No. 241277
Assistant United States Attorney
Fraud, Public Corruption & Civil Rights Section
601 D Street, N.W. | Washington, D.C. 20530
202.252.6887 | kondi.kleinman2@usdoj.gov